UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,

       Plaintiff,

V.                            NO.  3:19-cr-00163 (KAD)

MICHAEL VERZELLA,

       Defendant.           JUNE 5, 2020

## MICHAEL VERZELLA'S SENTENCING MEMORANDUM

This is a sentencing memorandum for Michael Verzella.  This is a case with bad optics presented within a vulnerable victim's framework.  When examined closely, however that cast overstates the seriousness of the offense.

Michael Verzella pleaded guilty on February 27, 2020 to a single count of Wire Fraud.  He committed that offense while employed as a Supervisor of Recreation at Chapel Haven, a non-profit corporation which provides for individuals with developmental limitations.  The defendant took money through the unauthorized use of an institutional credit card and, as well, took cash from what amounts to student activities funds.

1

The defendant intends to request a non-guideline sentence below the 33-41-month bracket calculated under the Sentencing Guidelines.  The information set forth below seeks to provide a basis for the imposition of the requested sentenced.  If incarcerated, Mr. Verzella requests a recommendation for a prison camp and for the RDAP Program.

## The Law of Sentencing

This Court well knows the applicable sentencing statute, 18 USC 3553(a).  It is set forth in the footnote below.[1]   The Court has

---

[1] In its entirety, 18 U.S.C. §3553(a) provides:

**(a) Factors to be considered in imposing a sentence.** --The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider--

**(1)** the nature and circumstances of the offense and the history and characteristics of the defendant;

**(2)** the need for the sentence imposed--

**(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

**(B)** to afford adequate deterrence to criminal conduct;

**(C)** to protect the public from further crimes of the defendant; and

**(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

**(3)** the kinds of sentences available;

received and will continue to receive, memoranda similar to this,

synopsizing the evolution of sentencing law from the adoption of

---

**(4)** the kinds of sentence and the sentencing range established for--

**(A)** the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

**(i)** issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(ii)** that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

**(B)** in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

**(5)** any pertinent policy statement--

**(A)** issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

**(B)** that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced. [FN1]

**(6)** the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

**(7)** the need to provide restitution to any victims of the offense.

the Sentencing Guidelines in 1987 to today, when guidelines are, happily, advisory, not presumed reasonable, and serve only as a starting point for analysis.  The basic law of post-Booker sentencing boils down to the following principles:

      1.  The guidelines are no longer mandatory but advisory;

      2.  The District Court's sentences are reviewed on an abuse of discretion standard for reasonableness;

      3.  A guideline sentence is not presumed to be reasonable; and

      4.  In imposing a non-guideline sentence, the Court is required to comply with the considerations set forth in 18 U.S.C. § 3553(a) and can afford whatever weight it believes is appropriate to each of the factors outlined in the statute (not the least of which is that the sentence imposed should be sufficient but not greater than necessary to satisfy the requirements of the statute).

The detailed footnote below sets forth a synopsis of the case law, hopefully avoiding repetition of case law well known to this Court, and the consumption of multiple, non-productive pages.[2]

---

[2]      In its en banc decision in United States v. Cavera, 550 F.3d 180 (2d Cir. 2008), the Second Circuit discussed the parameters of federal sentencing law in the wake of United States v. Booker, 543 U.S. 220, 226-27 (2005), which held that mandatory application of the Sentencing Guidelines was unconstitutional under the Sixth Amendment.  The Court in Booker ruled that the Sentencing Guidelines were effectively advisory, and that sentencing courts were permitted to fashion appropriate sentences for each offense taking into consideration not only the Guidelines range, but also the factors enumerated by Congress in 18 U.S.C. §3553(a). Further, such sentences would be reviewed for "unreasonableness." Booker, 543 U.S. at 261. "Review for 'unreasonableness' amounts to review for abuse of discretion."  Cavera, 550 F.3d at 187 (citing Gall v. United States, 552 U.S. 38 (2007)).

As the Cavera court recognized:

A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. In addition to taking into account the Guidelines range, the district court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The sentencing judge is directed, moreover, to consider: a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation. Id. § 3553(a)(2). Additionally, district courts must take into account: the kinds of sentences available, id. § 3553(a)(3); any pertinent Sentencing Commission policy statement, id. § 3553(a)(5); the need to avoid unwarranted sentence disparities among similarly situated defendants, id. § 3553(a)(6); and, where applicable, the need to provide restitution to any victims of the offense, id. § 3553(a)(7).

## SENTENCING CONSIDERATIONS

There are two absolutes in the criminal process:  first, sentencing is the hardest part; second, cases are never as simple as they first appear.  Both absolutes are present in this case.

This appears at first blush a simple case of employee theft involving sympathetic victims.  A full understanding of all that is involved comes only with an appreciation of the corporate and individual victims and the make-up of the defendant, his personal history, and how this case has impacted him.

### Nature and Circumstances of the Offense

This is the part of every sentencing memorandum that explains "how" the crime was committed.

The victim, Chapel Haven, is a non-profit corporation which provides residences and services for approximately 200 young adult clients who suffer from autism and other developmental limitations.  Chapel Haven has campuses in the Westville section of New Haven and in Tuscon, Arizona.   It is well-regarded for the services it provides and has become very successful.  It has a reported endowment of One Hundred Million Dollars.  It recently successfully completed a capital campaign of Forty-One Million Dollars.  In the

past year it completed a modern residences and classroom facility on its New Haven campus. Tuition at the New Haven campus for residents is approximately $70,000.00 and $40,000.00 for non-residents. In connection with the case against Mr. Verzella, Chapel Haven submitted an insurance claim of approximately $400,000.00. The insurance company honored only $220,000.00 of that claim.

Mike Verzella is a 41-year-old, college-educated man with no criminal record. He is married. He is the father of three children. He worked at Chapel Haven as its Recreation Supervisor for approximately 13 years. As part of his employment he was provided credit cards for recreation expenses such as entertainment trips to places like Six Flags or professional athletic events. He misused those cards for his personal benefit to purchase tickets for sporting and entertainment events for his family and friends. In addition, he bought gift cards he used for his personal benefit. The total amount of credit card usage was approximately $176,000.00 (PSR ¶18). He also took cash from student funds in the approximate amount of $68,000.00 (PSR ¶20). [3]

---

[3] The cash was from fees – usually $10.00 to $15.00 – paid by clients for "in house" events like dances, magic shows, bingo nights, etc., payments were often prepaid, and clients would not attend.

## **Characteristics of the Defendant**

This is the "who" and the "why" of every sentencing memorandum.  It seeks to provide an explanation of both the individual and his motivations and mind set.  It is not, nor is it meant to be, a justification.

Mike Verzella is a fellow who came to feel that life had left him behind.  He believed he had never really been respected by his family.  He believed that success was measured by material possessions.  He felt unappreciated and disrespected in his job at Chapel Haven as well. He used and abused a corporate credit card, but given the financial success of his employer, he never perceived he was taking "advantage" of a vulnerable or sympathetic victim.  He also took money from client funds.

Mike suffered from an even greater delusion for the cash part of the offense.  He liked the clients and liked serving them.  It was one of the few things that really gave him satisfaction.   He never allowed himself to recognize what he did was taking money "from" those clients (though it was); rather, he saw that the money taken was cash provided to clients by parents, guardians or Chapel Haven itself.  He did not see himself as taking the money from the clients and hurting the clients.

The money that Mike took – the credit card overages and the cash – was spent on friends and family.  Mike mistakenly hoped and believed that he could earn their respect by showing financial success.  He unsuccessfully tried to purchase esteem for himself and from others.  That failure is compounded by this prosecution.

Like all of us, Mike is shaped by his upbringing and driven and influenced by his insecurities.  We have submitted three separate reports from professionals who have examined Mike – Drs. Maya Prabhu (Exhibit A) and Dr. Madelon Baranoski (Exhibit B) of Yale and Margaret Antenucci (Exhibit C) an APRN.  The three reports give detailed insight into Mike's make-up and how his life has come unraveled since his arrest.  Mike's eldest brother Ken, was the successful one.  He's now an executive and financially successful.  His youngest brother, Brian, is the intellectual, now a religious monk residing in Massachusetts.  Mike never believed he fit in.  Fit in or not, he certainly never felt appreciated or respected.  He felt his parents gauged success by a materialistic yardstick.  And he believed he came up short.  While he enjoyed his job at Chapel Haven and enjoyed the work with his clients, he felt that he

could not, in his parents' eyes, live up to the accomplishments of either of his brothers.

Mike also felt resentment at work. He felt that his input was not respected or appreciated. He felt taken for granted and disrespected. He took advantage of the imprecise accounting systems at Chapel Haven to take money and buy tickets and gift cards he thought would buy him respect. These familiar but misguided emotions are what brings him to this Court.

Since these charges were presented, Mike's life has completely fallen apart. He is in free fall right now. As both Dr. Baranoski and Dr. Prabhu note, he is at risk for self-harm. That is a concern. As Dr. Prabhu states:

> The major concern for Mr. Verzella is his increased risk for self-harm/suicide as he approaches sentencing and continues to come to terms with possible separation from his children, family and remaining support structures. Both alcohol use and his prior suicidal ideation plus ongoing severe depressive symptoms put Mr. Verzella at heightened risk. His risk will also be high after incarceration as he struggles to remain future-oriented. Mr. Verzella would benefit from additional psychiatric monitoring before sentencing and might benefit from a higher level of care (either intensive day treatment program or inpatient hospitalization) with ongoing assessment and coping-skills training; a dual diagnosis program which includes alcohol and substance use education could be warranted. He will also need a careful mental health assessment and ongoing monitoring if incarcerated.

Similarly, Dr. Baranoski alerted to those same concerns:

> Although Mr. Verzella expressed no current suicidal thinking
> at the time of the evaluation and he expressed a strong deterrent
> related to the harm his suicide would cause his children, depression
> carries a risk for self-harm.  Mr. Verzella's impulsivity, especially
> in the presence of strong emotion, and the absence of support, put
> him at increased risk for suicide; additional monitoring and a
> higher level of treatment are warranted after sentencing.  His risk
> for suicide is likely to increase as sentencing approaches and will
> continue to be a significant risk with incarceration.  Mr. Verzella's
> shame, sense of failure and hopelessness, and in the past, his
> selection and significant planning for a lethal suicide method
> evaluate his risk.  Moreover, his belief that he has lost everything
> and his inability to imagine recovery from his failing make his
> risk for suicide pervasive and enduring.

Both mental health professionals note that there was a point in time when

Mike had made specific and detailed plans to end his life.  In recent weeks

leading up to the date of sentencing, Dr. Prabhu has expressed to counsel a

concern for self-destruction.

Mike's life has effectively fallen apart.  After foolishly leaving the

comfortable confines of Chapel Haven, he moved to Evergreen Woods in

Branford as a Recreation Director there.  He liked that job, but once arrested

for the fraud at Chapel Haven, Evergreen Woods fired him.  He then picked up

two separate menial jobs both at less than his Chapel Haven salary.  Those

jobs disappeared with the COVID-19 pandemic.  The family financial pressures increased.

Mike's marriage is a shamble.  Lisa is at the end of her rope.  Mike can't see around his own problems.  Both parents try to hold the family together.  Lisa will at some point file for a divorce.  Mike can't live at home without conflict, so he often stays with his parents.

It doesn't get better.  Mike has taken to drinking.  While never a teetotaler, the last two years led to heavy use and abuse of alcohol.  He periodically sits alone in his car, drinking.  Sometimes vodka.  Sometimes beer.  Sometimes more.  Sometimes less.

Mike Verzella is at a point where he recognizes his failures and the consequences.  He cannot see his way around them.  He cannot see a prospect for a better future.  He is not entirely wrong.  He's where he is because of his own choices and actions.  Always insecure, always feeling unappreciated, he acted impulsively to earn approval and respect of friends and family.  He accomplished the exact opposite.  He knows that.

## Guideline Calculations

Mike Verzella's guideline exposure is 33 to 41 months at Level 20.  (PRS ¶27-38).  This comes from applying a base offense with enhancements for amount (Section 2B1.1(b)(1)(f)) and three separate upward bumps of two levels each for the number of victims (2B1.1(b)(2)(A)(i)); vulnerable victims. (Section 3A1.1(b)(1); and abuse of position of trust (Section 3B1.3).  That calculation overstates the seriousness of the offense and is greater than necessary to fulfill the obligations of the statute.

There is no dispute that Mike Verzella abused a position of trust.  The "greater than necessary" conclusion results from an analysis of the enhancements.

That analysis is best demonstrated by separating the losses into two separate buckets – one the credit cards; the other the cash.

### The Credit Card Losses

The credit card losses total out to $175,872.58, the total of money spent on entertainment for friends and family and the personal use of gift cards. That total puts Mike plainly in the $150,000.00 to $250,000.00 loss brackets.

This, then, becomes a numbers-driven calculation with a base level 7 plus a loss enhancement of 10.

The Second Circuit has questioned the Sentencing Commission's methodology unanchored to any empirical foundation. It has encouraged sentencing courts to engage in an offense-driven rather than a numbers-driven approach. Writing for the Court in United States v. Algahaim, 842 Fed. 3d 796 (2016), Judge Newman stated:

> We . . . recognize that the Commission had the authority to construct a set of guidelines that used loss amount as the predominant determination of the adjusted offense level for monetary offenses.
>
> But the Commission could have approached monetary offenses quite differently. For example, it could have started the Guidelines calculation for fraud offenses by selecting a base level that realistically reflected the seriousness of a typical fraud offense and then permitted adjustments up or down to reflect especially large or small amounts of loss. Instead, the Commission valued fraud (and theft and Embezzlement) at level six, which translates in criminal history category I to a sentence as los as probation, and then let the amount of loss, finely calibrated into sixteen categories, become the principal determinant of the adjusted offense level and hence the corresponding sentencing range. This approach, unknown to other sentencing systems, was One the Commission was entitled to take, but its unusualness is a circumstance that a sentencing court is entitled to consider. (citations omitted) . . . Where the Commission has assigned a

14

rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence.

842 Fed. 3d at 800.

These credit card losses fall into the category described by Judge Newman.  It is just arithmetic; a numbers-driven calculation unrelated to the nature of the offense.  This part of the case is pedestrian, a corporate employee overusing a corporate credit card for an insured employer[4].  Whether the employer is United Technologies, Yale University, Mohegan Sun or Chapel Haven is inconsequential.  It is a common, every-day offense.  Chapel Haven is a successful institution with a significant endowment which has recently engaged in a successful fundraising drive leading to the construction of a modern residential facility designed by a prestigious architectural firm.  Chapel Haven is not a vulnerable victim.

This "bucket" of Mike Verzella's offense, without the enhancement for vulnerable victim, comes out to a total offense level of 16 with an exposure of 21 to 27 months.  That is calculated as follows:

---

[4] As noted, Chapel Haven's insurance claim was for approximately $400,000.00; only $220,000.00 of that was honored by the insurance company.

| | |
|---|---|
| Base Offense | 7 |
| Loss Amount | 10 |
| Abuse of Trust | <u>2</u> |
| Total Offense Level: | 19 |
| Acceptance of Responsibility | -<u>3</u> |
| Total Offense Level: | 16 |
| Sentencing Range | 21 to 27 |

In this context it is simply another credit card offense by an employee from an insured employer.  Vulnerable victim does not apply.  That sentencing range magnifies the seriousness of the offense and calls for a greater than necessary sentence.

**<u>The Cash Losses</u>**

The second "bucket", presents a more complex and nuanced issue.  The cash taken from clients, totals much less, but is complicated by the victim-related enhancements.  The loss is $68,000.00.  Standing alone the Guidelines calculate to an Offense Level of 16 with a 21 to 27-month exposure follows:

| | |
|---|---|
| Base Offense | 7 |
| Loss Amount | 6 |

| | |
|---|---|
| Abuse of Trust | 2 |
| Vulnerable Victims | 2 |
| Number of Victims | <u>2</u> |
| | 19 |
| Total Offense Level | 16 |

This part of the case is really the flip side of Judge Newman's discussion in <u>Algahaim</u>.  The seriousness of the case is gauged by not the loss amount but by the victim related considerations – vulnerability and number.
Even then, a close analysis reveals that the vulnerable victims label overstates the seriousness of the offense.

To be clear, the defendant does not dispute the abuse of trust; the number of victims; or, in fact, their vulnerability.  The extent of the harm has to be assessed.  The losses came about because periodically clients would pay for in-house entertainment events by advance deposits of $10.00 or $15.00.  Often the sign-ups – wouldn't show up for the event.  That cash was not returned.  Over time, obviously, those added up.  (The average loss per client

arithmetically is $340.00 ($68,000.00 divided by 200) total or about $70.00 per year cover a five-year period).

The total loss, then, was basically cash not returned to clients for events they had prepaid for but did not attend. Most often this money was not in fact client money in the sense that it had been saved or earned; rather, given the demographics of Chapel Haven, it was money provided by parents or guardians. So, the loss, then, applied mostly to individuals who were providing cash to the clients. They are angry and have a right to be. But the dimensions of the loss are less than they appear. No client was deprived of room, food, light, heat or clothing. Projecting this part of the case through the vulnerable victims lens magnifies the harm caused by those losses. The cash loss represented money from clients either did not attend an entertainment event for which they had paid and did not receive a refund.

None of this should be read to mean that Mike Verzella claims that he didn't commit a crime; that he doesn't accept responsibility for that crime; or, importantly, that he does not have contrition for the crime he committed. The reverse of all that is true. Mike's greatest regret is that having worked with, socialized with and developed friendships with the clients, he betrayed their

trust.  Somehow, he convinced himself that he wasn't really doing that when he took the money that had been provided them.  A dysfunctional moral compass broken by insecurity and low self-esteem.  Mike has lost a job and a profession from which he received substantial satisfaction.

## Other Statutory Considerations

There are a number of other statutory considerations that which the Court must weight, including a sentencing that reflects a seriousness of the offense, promotes respect for the law, protects the public; as well as attending to needs of the defendant; and protecting the public from future acts of the defendant.  Of the remaining statutory considerations, however, two are most prominent:  deterrence and the need to avoid sentencing disparity.

Defendants inevitably claim that the prosecution of the case has achieved specific deterrence.  It has become trite but is nevertheless accurate.  Specific deterrence has been accomplished in this case.  Mike Verzella has no prior criminal record.  His life is falling apart.  It is all but impossible he ever will find himself in a position to again commit a criminal offense.  His goal now is to endure through what is to follow and to hopefully come out on the other

side restored in a way that he can re-establish maintaining a relationship with his children and family.

As to general deterrence, many feel this is an illusory concept. No one case will ever establish the type of deterrence conceived by the drafters of the sentencing statute. The sentencing this a larceny/fraud case will have, we submit, no effect on general deterrence.

On the issue of sentencing disparity, it is difficult without specifics to know all the cases that have come through this Court over the past year. One can only rely on statistics. According to the statistical information packet of the United States Sentencing Commission for this District, there is near 50% variance in sentences in fraud, theft and embezzlement cases. That comes about, once suspects, from an ability of the judges in this district to gauge individual defendants and to examine their cases from the perspective outlined in Judge Newman's decision, taking into account the nature of the offense and the offender. We encourage the Court to do so here.

**Additional Submissions**

In addition to the submissions from three mental health professionals, we have also submitted separately a quantity of letters which will provide information to the Court to assist it in imposing the appropriate sentence.

**Conclusion**

As set forth in the opening paragraph of this memorandum, the defendant requests the following:

1.  A non-guideline sentence;

2.  If incarceration is required, a recommendation for a prison camp; and

3.  In light of Mr. Verzella's alcohol difficulties, a recommendation for the RDAP Program.

RESPECTFULLY SUBMITTED,

THE DEFENDANT,
ROBERT CAPELLI

By /s/ William F. Dow, III
William F. Dow, III (ct00161)
JACOBS & DOW, LLC
350 Orange Street
New Haven, CT 06511
Telephone:  203-772-3100
Facsimile:  203-772-1691
E-Mail:  wdow@jacobslaw.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on June 5, 2020 the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

/s/ William F. Dow, III
William F. Dow, III

# EXHIBIT A

## TO BE FILED UNDER SEAL

# EXHIBIT B

## TO BE FILED UNDER SEAL

# EXHIBIT C

## TO BE FILED UNDER SEAL